JOHN BERNARD, Respondent, v. FREDERIK LÜPPING *et al.*, Appellants.

*Sunday—Contract.*—No damages can be recovered for a breach of contract for unnecessary labor to be done on Sunday, such as playing music at a beer-garden. (R. C. 630, § 33.)

*Appeal from St. Louis Law Commissioner's Court.*

The testimony in this case shows such an utter confusion of ideas, as to matters sacred and profane, as to become really amusing; and for this reason we submit it in full, for permanent preservation.

The plaintiff called as a witness John F. Lubbering, who testified as follows:

" I know the parties to this suit. The defendants kept Hyde Park during the spring of 1859 ; I was engaged there from the first of May to the last of July. Hyde Park was doing business like all the other parks ; it had amusements, and all kinds of refreshments, and sacred concerts, on Sundays. There was no dancing ; the music was sacred, and not to be danced by. I know the plaintiff, Bernard ; he was employed at Hyde Park the latter part of May, or first of June, with his band. The defendants authorized me to employ them ; defendant Lüpping approved my act of employing them. I employed the plaintiff to play with his band, for the season, at fifty dollars a Sunday, pleasant weather, and twenty-five dollars a Sunday in unpleasant weather. I was there the 10th July, 1859 ; plaintiff was there, with some of his musicians. Another brass band was already there before Bernard's. He usually commenced playing at 2 or 2½ P. M. ; Bernard was there at 2 P. M. this time."

On cross-examination, the same witness testified as follows:

" They had a shooting-gallery, quoits, swings, ten-pin alley, flying-horses, refreshments, beer, ice-cream, wine, etc., at the park on Sunday, the 10th July last. Bernard's band had one big fiddle, and other fiddles, and one brass wind instrument ; I don't now recollect the tunes played. I can't say I

saw any one drunk there the 10th of July last. There were no funeral or religious services there. I don't know whether Bernard offered to play there that day; neither he nor his men did play. Bernard had played two or three Sundays before. They had a place at the park for German ladies to dance at their festivals. That which I call sacred music is holy music, five-string music—that which cannot be performed by a brass band. Among the tunes played were a good many overtures; there were some national airs—I do not remember what. There was no meeting; nobody that 'kept meeting;' all met there—some at tables, for glasses of beer, etc. I don't think you would find such things in churches. People might have been there for the charitable purpose to keep the owners up and not let them go to ruin. Defendants kept the park, like all other parks, to make money from, of course. We had a band to draw a great crowd into the park; the stand where the band played was near the bar and house, in the front part of the park, under the largest trees."

Being re-examined, he further testified as follows:

"Bernard had been paid fifty dollars a Sunday for playing. The defendants had all these things in the park in order to make money. The music was advertised in all the papers."

Plaintiff next called G. L. Rölker, who testified as follows:

"I knew Hyde Park in the spring of 1859. I was present at the contract; it was fifty dollars pleasant Sundays, twenty-five dollars bad weather. I attended to the bar, and was there second and third Sundays in May; Bernard's band played; I sold beer at the bar; there were four other bar-keepers."

Cross-examined.—"They might have sold whisky. The swings, etc., were in operation; there were many people there."

Plaintiff next called John H. Lindemaier, who testified that he attended to the advertising of the programme for defendants, at Hyde Park.

Cross-examined.—"The advertising was done to draw a crowd. I heard Bernard's band play some sacred music, as

played in churches; it was sacred music; sacred music is such as touches the heart; I don't know the names of the tunes. Sacred music is solemn music, such as don't harm anybody ; brass bands sometimes play sacred music ; the air ' O, Susanna,' if well played, would be sacred music. On no Sunday did I see any one pray at Hyde Park ; I saw families sitting on the grass there ; it might have been a kind of meeting; they were drinking beer and sherry-cobblers. I can't tell what I mean by sacred ; the word ' sacred ' was in the advertisements."

Plaintiff next called H. C. Nordman, who testified as follows :

" I play on tenor violin ; was at Hyde Park, as one of plaintiff's band, on the 10th of July ; we were not permitted to play ; I did not see any of plaintiff's band present. When we did play, we played overtures, sacred marches, and selections from operas. I have been a musician from a child. Some of those pieces were solemn, some light; a piece that has quick time I call light; I think that light music is as sacred as any music that ever was played ; Mozart's Symphony has much quick time in it. The music played was generally of the run of a sacred concert. On July 10, Bernard was at Hyde Park twenty-five or thirty minutes before the usual time, with his band, consisting of thirteen or fifteen musicians."

*Cross-examined.*— " The band played ten or twelve pieces of a Sunday afternoon. Sacred music is solemn, such as the overture to Norma, Gems from the Bohemian Girl, which we played. We played all kinds of opera music, sacred music from Mendelsohn's Midsummer's Night Dream, and some things from Lucretia Borgia. I do not know whether sacred music has any connection with religious things ; it may have, or may not. Gambling is called sacred by gamblers."

Plaintiff next called Louis Sanguinett, who testified as follows :

" I have been a musician from infancy. I was one of Bernard's band, and have played the same pieces in churches as

I played at Hyde Park; I was one of those not allowed to play. It was sacred music we played there; national airs are also sacred."

*Cross-examined.*— "By sacred music I mean opera music, which is generally played in Italy in churches. I cannot explain what the word ' sacred ' means; I mean by it what is sweet, not noisy; the opera *I Puritani* is sweet and sacred. I don't know any music that we could have played there that would not have been sacred; if Yankee Doodle had been played, it would have been sacred."

The defendant Lüpping then called Wilson Mooney, who testified as follows:

" I know Hyde Park; knew it this spring; Fred. Lüpping told me they had that park. I was there one Sunday when there was drinking, rolling ten-pins, swinging, etc. There was no religious worship, or funeral, or meeting for charitable purposes, on the 10th of July, Sunday; people went there for pleasure, and for the purpose of getting refreshments; I can't say what tunes were played; besides the programme, the band played such tunes as were called for by the bystanders."

*Cross-examined.*— "I am still at Hyde Park; it is a place of recreation; there is no dancing there on Sunday."

Defendant Lüpping then called Augustus Schroeder, whose testimony was as follows:

" I was employed at Hyde Park, as barkeeper, last spring. I saw Bernard there on the 10th day of July; he had no instrument, and some of his men were there without instruments. I was busy, as barkeeper, and sold sherry-cobblers, etc. There were two music stands in the park on that day; I have seen twelve musicians on the smaller stand."

*S. Eaton* and *J. C. Moody*, for appellant.

I. A contract to do an act contrary to a penal statute is void, and no action can be maintained thereon. (2 Pars. on Cont. 252; Skinner v. Henderson, 10 Mo. 205; Foster v. Taylor, 5 Barn. & Ald. 887.)

II. The contract between the parties was contrary to the statute (R. C. 1855, p. 630, § 33) relating to Sunday labor.

III. The statute is constitutional. (State v. Ambs, 20 Mo. 214 ; City of St. Louis v. Caffarata, 24 Mo. 94.)

IV. Calling beer-garden concerts by the name of sacred concerts does not change their character, nor exempt them from the operation of the legal rule.

No brief on file for respondent.

DRYDEN, Judge, delivered the opinion of the court.

The defendants were the keepers of Hyde Park, in St. Louis, a place of public amusement of extensive resort, where various sports were provided for the entertainment of visitors, such as quoits, ten-pin alleys, shooting-galleries, swings, and flying-horses ; and where beer, wine, ice-cream and other refreshments were sold and consumed ; and to add to the attractions of the place of Sundays, the services of a band of musicians were in requisition. The plaintiff, it seems, was the leader of a musical band, and was under contract with the defendants, by which he was to render them the services of his band on Sundays at the sum of fifty dollars per day in good weather, but in bad at twenty-five dollars. On Sunday, the 10th of July, 1859, the plaintiff was on hand, in full force, in due time, ready for the performance, but the defendants, whether without cause or for good cause is not material, refused to accept his services. The plaintiff then sued the defendants, before a justice of the peace, for fifty dollars' damages for breach of the contract, where he recovered a verdict and judgment, from which the defendants appealed to the Law Commissioner's Court, where a trial was had resulting as the first—from which last judgment the defendants have appealed to this court.

On the trial in the Law Commissioner's Court, after the plaintiff had proved the contract and its breach, and the character of the performances and exercises, as above stated, at Hyde Park, the defendants asked the court to instruct the jury that, upon the plaintiff's own evidence, he could not

recover a verdict; but the court refused so to instruct. The instructions ought to have been given. The plaintiff had himself shown that the work contemplated by his contract had none of the characteristics of " the household offices of daily necessity, or other work of necessity or charity," but was of a kind in plain violation of a wholesome statute, and its performance was from considerations purely mercenary. The law could not, without casting reproach upon itself, lend a helping hand, as in this case it is asked to do, to enforce a contract made in contempt and disregard of the law.

Let the judgment be reversed and the cause dismissed ; the other judges concurring.